AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| The premises located at 2826 Old Hanley Road, St. Louis, Missouri 63114 further described as a two story, split level residence, with the front of the residence constructed of vinyl. The subject property has a white garage door and the entrance to the residence faces the approximate west. The front door has a covered roof and the numbers "2826" are clearly visible on a post to the left of the main door. | ) Case No. 4:21 MJ 8161 (SRW) <br> ) <br> ) <br> ) <br> )SUBMITTED TO THE COURT AND <br> )SIGNED BY RELIABLE ELECTRONIC <br> )MEANS <br> ) |

## APPLICATION FOR A SEARCH WARRANT

I, CHRISTOPHER MOST, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**The premises located at 2826 Old Hanley Road, St. Louis, MO 63114 as fully described above,**

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed see ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

✓ evidence of a crime;
✓ contraband, fruits of crime, or other items illegally possessed;
✓ property designed for use, intended for use, or used in committing a crime;
❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., §§ 846, 841(a)(1) | Conspiracy to distribute and possess with intent to distribute controlled substances |
| Title 18, U.S.C. §§ 1956 and 1957 | Laundering of monetary instruments |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓ Continued on the attached sheet.
❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**I state under the penalty of perjury that the foregoing is true and correct.**

_____
*Applicant's signature*

CHRISTOPHER MOST, Special Agent
Drug Enforcement Administration
*Printed name and title*

**Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.**

Date:   May 21, 2021.

City and State:   St. Louis, MO

_____
*Judge's signature*

Hon. Stephen R. Welby, U.S. Magistrate Judge
*Printed name and title*

AUSA:   STEPHEN CASEY

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Christopher Most, being duly sworn, depose and state:

## I. INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search **2826 Old Hanley Road, St. Louis, Missouri 63114** further described below and depicted in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent of the Drug Enforcement Administration (DEA), and have been so employed since February 2017. I am currently assigned to DEA St. Louis Group 33, which is responsible for conducting investigations of drug trafficking offenses and also specializes in the interdiction of illegal drugs and drug proceeds that are transported in part via commercial airlines, automobiles, public transport, and commercial shipping services. Prior to my employment with DEA, I was a police officer, and homicide detective, with the St. Louis County Police Department, in St. Louis, Missouri, for approximately 15 years.

3.      I am familiar with and have used normal methods of investigation, including, but not limited to, visual and electronic surveillance, questioning of defendants and witnesses, the use of search and arrest warrants, the use of pen registers, the use of undercover agents, the use of confidential sources, and the use of court-authorized wire intercepts. Based upon my training, experience, and understanding of this investigation, I believe that individuals engaged in drug trafficking and money laundering often keep and maintain certain evidence of their crimes in their respective residences, to include those items set forth in Attachment B.  I additionally believe documents, records, wireless telephones, tablets, and other digital media containing evidence, fruits, and instrumentalities linked to illegal drug trafficking activities will be discovered within the **subject property.**

1

4.     The statements in this affidavit are based in part on my own participation in the investigation described below, as well as information provided by other law enforcement officials, and on my experience, training and background.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## II.     LOCATION TO BE SEARCHED

5.     This affidavit is submitted in support of an application for the issuance of a search warrant for the premises and computers, computer hardware, wireless telephones, digital storage media, and other digital media found therein at **2826 Old Hanley Road, St. Louis, Missouri 63114** (the "**subject property**"). The **subject property** is a two story, split level residence, with the front of the residence constructed of vinyl. The **subject property** has a white garage door and the entrance to the residence faces the approximate west. The front door has a covered roof and the numbers "2826" are clearly visible on a post to the left of the main door. The **subject property** is currently occupied by Danielle COLLINS. A photograph of the **subject property** is attached hereto as Attachment A.

## III.     DEFINITIONS

6.     The following definitions apply to this Affidavit and Attachment B to this Affidavit:

a.     Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those

functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

   b.  The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers,  or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

   c.  "Wireless telephone": A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and

accessing and downloading information from the Internet. A wireless telephone may have wireless connection capabilities such as Wi-Fi and Bluetooth. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      d.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

## IV.   OVERVIEW OF INVESTIGATION

      7.    I am part of an experienced team of drug investigators currently investigating the criminal activities of Kenneth THOMAS, Stephen GRIFFIN, and other co-conspirators, both known and unknown. This investigation has established evidence that THOMAS and others are engaged in a conspiracy to distribute fentanyl, heroin, methamphetamine and cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957. THOMAS is part of a drug trafficking organization (DTO) operating between Missouri, California, and Mexico. To date, the investigative team has seized approximately 12.5 kilograms of fentanyl and 4 kilograms of cocaine directly attributable to THOMAS.

      8.    As described below, DEA St. Louis Group 33 first investigated THOMAS in 2019. As a result of this investigation, DEA seized approximately 12 kilograms of fentanyl from a storage unit maintained by THOMAS, who subsequently fled the area to avoid prosecution and was declared a federal fugitive. In 2020, during what was initially believed to be a separate case, DEA Group 33 began an investigation of Silas SMITH's fentanyl distribution. This led to a joint investigation with the United States Postal Inspection Service (USPIS) St. Louis Contraband Interdiction and Investigation Team, DEA San Ysidro, DEA St. Louis Group 28, DEA Tulsa, and

others after it was discovered that the SMITH DTO and the Stephen GRIFFIN DTO were both supplied by the same Mexico and California-based cell of the Cartel Arellano Felix, a/k/a "CAF," a/k/a Tijuana New Generation Cartel. The investigation has also established evidence that THOMAS is a key member of the cartel responsible for directing and coordinating shipments of fentanyl, heroin, and methamphetamine from Mexico to the St. Louis area. To date, the USPIS St. Louis Field Office and DEA St. Louis Group 28 have seized over 100 pounds of methamphetamine, fentanyl, and heroin that is directly attributable to the GRIFFIN DTO and sourced by THOMAS' organization.

9.     THOMAS has a criminal history that includes arrests and/or convictions for felony Possession of a Controlled Substance, Marijuana Possession, Unlawful Possession of a Concealed Firearm while Receiving Stolen Property, Trafficking in Drugs, and Domestic Assault. As the result of a separate DEA St. Louis investigation, on March 26, 2014, THOMAS was sentenced to 90 months federal incarceration and 60 months supervised release for Possession with Intent to Distribute Cocaine and Marijuana. A Bureau of Prisons records check revealed THOMAS was released on December 4, 2018. As detailed in greater detail below, THOMAS is a federal fugitive after investigators seized approximately 12 kilograms of fentanyl and $65,000.00 from a storage unit used by THOMAS.

10.     Danielle COLLINS has been identified as a paramour of, and facilitator for, THOMAS. As further described below, evidence obtained from shipment records, recovered iCloud data, telephone toll records, confidential source information, and geolocation information indicates COLLINS is engaged in the receipt of drug proceeds on behalf of THOMAS, and the storage and shipment of those proceeds to THOMAS. Additional information detailed below indicates COLLINS is financially supported by THOMAS and participates in laundering drug

proceeds. Investigators believe that the **subject property** is likely to contain the kinds of evidence of these illegal activities more fully described in Attachment B.

## V.    PROBABLE CAUSE

### A.    Criminal Complaint Against THOMAS

11.    On September 5, 2019, a cooperating defendant informed DEA Special Agent (SA) David Morton that he/she frequently purchased between 10 and 15 ounces of raw heroin from an individual named "KP" and was due to pick up the same amount of heroin from "KP" later that day. "KP" was later identified as THOMAS. On the same date, the cooperating defendant met with THOMAS in an attempt to conduct a controlled pick-up of drugs. THOMAS arrived in a rental vehicle. Subpoenaed rental agreement information revealed the vehicle was rented by Danielle COLLINS. The rental agreement listed phone number (314) 537-5575 as the contact phone number. COLLINS is the listed subscriber of (314) 537-5575.

12.    While no drug exchange occurred, Group 33 investigators followed THOMAS to a storage unit after he left his meeting with the cooperating defendant. On September 11, 2019, investigators executed a federal search warrant for the unit, which revealed it contained approximately 12 kilograms of fentanyl packaged in multiple bundles. Laboratory testing later determined THOMAS' fingerprints were present on many of the recovered bundles of fentanyl. It is believed THOMAS fled the St. Louis area to Tijuana, Mexico following execution of the search warrant.

13.    On September 20, 2019, the Honorable Judge Shirley P. Mensah, United States Magistrate Judge, Eastern District of Missouri issued a criminal complaint against Kenneth THOMAS for a violation of Title 21, United States Code, Section 841(a)(1). An arrest warrant for THOMAS was issued and THOMAS is currently a fugitive.

**B.      Expansion of the THOMAS Investigation**

14.      On June 12, 2020, SA Morton spoke with United States Postal Inspection Service (USPIS) Inspector Jordan Wicks, who stated he had received information from DEA San Diego, San Ysidro Resident Office (hereinafter "DEA San Ysidro") that a suspicious United States Postal Service (USPS) package was destined for 6618 Minnesota Avenue, St. Louis, MO 63111. The location was previously identified by Group 33 investigators as a suspected fentanyl stash house used by Silas SMITH, a fentanyl distributor who is now deceased.

15.      Inspector Wicks seized the package and obtained a federal search warrant for it. The package contained approximately 553.8 grams of a substance that tested presumptively positive as fentanyl.

16.      Further coordination with Inspector Wicks and DEA San Ysidro revealed the fentanyl shipment to 6618 Minnesota Avenue was facilitated by a California and Mexico-based DTO under investigation by DEA San Ysidro.[1] Between June 8 and June 15, 2020, during the court authorized monitoring of several Snapchat accounts, DEA San Ysidro intercepted conversations about the shipment of the seized package described above. These conversations, which occurred between Snapchat accounts "LEOG_420" (believed to be used by Leonel Alfredo GANDARA-BRIONES), "Mobelous" (believed to be used by Raymundo DELEON), and Snapchat account Ghost_8388 discussed shipment of the package to 6618 Minnesota Avenue.

17.      Snapchat subscriber information obtained by DEA San Ysidro revealed "sevenwaz@icloud.com" was the e-mail address associated with the "Ghost_8388" Snapchat

---

1. It should be noted that DEA St. Louis Group 28 and USPIS are currently investigating the Stephen GRIFFIN DTO, an organization active in the St. Louis area that distributes multi kilogram quantities of fentanyl and methamphetamine. The same DTO believed to be responsible for shipping the fentanyl package destined for Minnesota Avenue has also been found to supply the GRIFFIN DTO with illegal drugs, and residences utilized by the GRIFFIN DTO have received suspected or confirmed drug packages.

account. The name associated with the account was "Kanon Clerk." A search of a commercial database revealed no one in the United States with that name.

18.    On December 1, 2020, the Honorable Patricia L. Cohen, Magistrate Judge, Eastern District of Missouri, authorized a search warrant for the iCloud account associated with e-mail address "sevenwaz@icloud.com." The account information obtained via the search warrant revealed THOMAS is the user of the iCloud account associated with the "Ghost_8388" Snapchat account.

### C.    Identification of THOMAS and COLLINS' Means of Communication

19.    Review of iMessages saved in THOMAS' iCloud account revealed numerous iMessages exchanged between phone numbers (213) 304-9743 and (323) 253-4701. Phone number (213) 304-9743 was the contact phone number listed in the subscriber information of the "Ghost_8388" Snapchat account and as one of two phone numbers associated with the "sevenwaz@icloud.com" iCloud account. For these reasons, I believe THOMAS is the user of phone number (213) 304-9743.

20.    Earlier in the investigation, SA Morton obtained the toll records of phone number (213) 304-9743 between July 15, 2020 and August 14, 2020. During this timeframe, the device was in contact with only 8 different known phone numbers via phone call and/or text message. Phone number (323) 253-4701 was the most frequent contact with (213) 304-9743.

21.    SA Morton subsequently obtained the call records of phone number (323) 253-4701 occurring between July 15, 2020 and September 13, 2020. The phone made or received just 356 phone calls during the specified time period. Among this small number of callers, phone number (323) 253-4701 was in contact with a phone number associated with the Silas SMITH DTO, a

phone subscribed to GRIFFIN DTO member Jovon HARRIS, and two phone numbers found to be in contact with Stephen GRIFFIN.

22.     Based on the identification of "Ghost_8388" as THOMAS and the phone toll analysis described above, SA Morton suspected COLLINS was the user of phone number (323) 253-4701. Review of iMessages recovered from THOMAS' iCloud account support this belief. For instance, on November 14, 2020, (323) 253-4701 sent a message to THOMAS at (213) 304-9743. The message stated "Should be leaving in 30 then I will go deal with bed. Then I will get ready for shug them thing." Shortly after, THOMAS responded "Thought they check in at 3." The (323) number responded "They already checked in. She called at 1 something asking could she check in early. I told her that was fine. But I needed to come fix something still she told me it was fine and to take my time."

23.     On February 17, 2021, DEA St. Louis Group 28 Task Force Officer (TFO) Daniel Sanders informed me that he had identified COLLINS' publicly accessible Instagram page on which COLLINS listed a link to a property that she rents on AirBNB. The property lists a check-in time of 3:00 p.m.. In light of this information, SA Morton interpreted the iMessage exchange detailed above to reference COLLINS attending to guests at her AirBNB property that checked in early and required a repair at the property.

24.     SA Morton has identified (972) 880-5158 as another phone used by THOMAS. The iMessage data contained in THOMAS' iCloud account was provided by Apple in Excel spreadsheet form. A column titled "Message DCID" specified a phone number associated with each iMessage contained in the iCloud account. The "Message DCID" column listed just one of three phone numbers for each of the recovered iMessages contained in the spreadsheet; the three phone numbers were +12133049743, +14695881893, and +19728805158. The first two phone

numbers are listed in the subscriber information of THOMAS' iCloud account and are, therefore, believed to be used by THOMAS. Consequently, SA Morton interpreted the "Message DCID" column to specify the particular phone number associated with the iCloud account that sent or received a particular iMessage. Other messages sent or received by phone number (972) 880-5158 communicated with the (323) 253-4701 phone number believed to be used by COLLINS and included use of terms of endearment and mundane conversations that were consistent with other messages sent between phones believed to be used by COLLINS and phones believed to be used by THOMAS.

25.    On July 12, 2020, phone number (972) 880-5158 sent a message to COLLINS' suspected phone number (323) 253-4701 that stated "So far this phone horrible;" COLLINS later replied "Yea I dunno if it's my phone or yours." In January 2021, SA Morton obtained the subscriber information of phone number (972) 880-5158 and learned that it is a prepaid device activated on June 11, 2020 at a Boost Mobile location at 9100 West Florissant Avenue, St. Louis, MO 63136. For these reasons, investigators believe THOMAS is the user of phone number (972) 880-5158.

26.    Messages further confirm that THOMAS is utilizing multiple phones. On November 15, 2020, THOMAS, using (213) 304-9743, sent a message to COLLINS using (323) 253-4701 that stated "Change your line today boo." COLLINS responded "Ok baby." Approximately 90 minutes later, phone number (469) 262-8886 sent an SMS message to THOMAS at phone number (469) 588-1893. The message from COLLINS to THOMAS stated "Hey babe." Given this timing, SA Morton interprets this message to be a communication from COLLINS notifying THOMAS of her new number. It is notable that phone number (469) 262-8886 was saved in THOMAS' iCloud contacts under the name "N �male♥." SA Morton believes

the depiction of a heart and wedding ring allude to THOMAS' romantic relationship with COLLINS, which are evident in the notes, pictures, and messages recovered in THOMAS' iCloud account. The use of the first letter of COLLINS' name "Nicole" is also significant. For these reasons, the investigative team believes that phone number (469) 262-8886 is also used by COLLINS.

27.     Based on my experience and training, I am aware that individuals engaged in criminal activity as described herein often "dump" or exchange their telephones and electronic devices for new devices. Further insulating themselves from law enforcement detection, such individuals are known to subscribe to telephone and wireless communications and data services in other persons names and to frequently change their telephone number and or ESN's/IMSI numbers.

### D.     COLLINS' Role in the DTO

28.     Based on iMessages contained in THOMAS' iCloud account, confidential source information, and USPS and DHL shipping records, the investigative team believes that COLLINS is involved in the receipt of drug proceeds from St. Louis area drug distributors and the storage and shipment of those proceeds to THOMAS. For instance, on July 20, 2020 at approximately 10:12 a.m. (Central Standard Time), the following exchange occurred between phone number (972) 880-5158 and COLLINS using phone number (323) 253-4701:

THOMAS: When can bf link ? [Investigators interpret this means that an unknown individual called "bf" asked THOMAS when he/she could meet with COLLINS.]
COLLINS: When
COLLINS: As soon as I'm off at 5 is that ok? Unless he can meet in the next 30 mins
THOMAS: Where at in 30 ?
THOMAS: Nvm yea 5 is cool ["NVM" is a common abbreviation for "never mind."]
COLLINS: Galleria ["Galleria" likely refers to the St. Louis Galleria, a shopping mall in St. Louis, MO.]

29.     SA Morton believes this exchange captures THOMAS directing COLLINS to meet up with an unknown individual. THOMAS asks COLLINS when an unknown individual referred

to as "BF" (possibly initials) can meet up ("link") with COLLINS, who replies that she is free after her work day ends at 5, or within the next 30 minutes. THOMAS ultimately agrees that "BF" should meet COLLINS at approximately 5:00 p.m., and COLLINS specifies that "BF" should meet her at the Galleria shopping mall. Based on THOMAS' line of questioning, SA Morton believes THOMAS acted as an intermediary between COLLINS and "BF." The investigative team know from their experience and training that drug traffickers will sometimes use trusted confidantes, such as a paramour, to receive drug proceeds from their customers. These customers sometimes do not know the identity of the courier, and instead are provided with a meeting location and description of the individual to whom they are directed to provide payment. This is done in an effort to conceal the trafficker's method of receiving and storing drug proceeds.

30.  On November 15, 2020, THOMAS using phone number (469) 588-1893 and COLLINS using phone number (469) 262-8886 exchanged the following messages:

THOMAS: Cuz shit important bf not ["Cuz" is an abbreviation for "cousin," a common term used to refer to a close or friendly associate. Investigators believe this to mean that THOMAS was telling COLLINS a close associate ("Cuz") had something important for COLLINS that was more important that what "bf," the same name used in the message previously described, also had for COLLINS.]
THOMAS: So worse come to worse I'll have cuz bring it or come really close [Investigators interpret this to mean that THOMAS would direct "Cuz" to bring something to COLLINS' residence, or to travel to a location near her home.]
THOMAS: His is the important
COLLINS: Liked "So worse come to worse I'll have cuz bring it or come really close "
COLLINS: Liked "His is the important "

31.  SA Morton believes this exchange captures THOMAS directing COLLINS to receive drug proceeds from at least two individuals. THOMAS tells COLLINS that meeting with "Cuz," a common abbreviation for "cousin" and a term of endearment or familiarity, is more important than meeting with "BF," likely the same "BF" mentioned in the intercepted messages previously described. THOMAS then states that he will direct "Cuz" to bring "it," or otherwise

"come really close," meaning "Cuz" will bring "it" directly to COLLINS' residence or otherwise to a location near COLLINS' residence. Due to the need for such coordination between THOMAS, COLLINS, and "Cuz," as well as THOMAS' guarded language, SA Morton believes that brining "it" refers to "Cuz" bringing drug proceeds to COLLINS at THOMAS' direction. THOMAS then reiterates that "Cuz" is more important than "BF," possibly indicating "Cuz" has a much larger amount of money to provide to COLLINS than "BF." COLLINS acknowledges these directions by "liking" several of these messages.

32.     On November 16, 2020, THOMAS using phone number (469) 588-1893 and COLLINS using phone number (469) 262-8886 exchanged the following messages:

THOMAS: 830-499-4642 [This phone number was identified by DEA St. Louis Group 28 as a phone number used by GRIFFIN.]
THOMAS: Now they won't answer
THOMAS: This been one hell of a morning already
THOMAS: I one knows how stressful this shit is
COLLINS: Disliked "Now they won't answer "
COLLINS: I know baby.
COLLINS: Everyone not business oriented
THOMAS: He got another 10 [In my training and experience, I know it is common for drug traffickers to abbreviate a quantity of bulk cash by omitting the reference to "thousand." Consequently, I interpret this to refer to $10,000.]
COLLINS: 😊📱☐ ☐
COLLINS: For me or to pack [I interpret this to mean COLLINS was unsure if she should ship the money to THOMAS or keep it for herself.]
THOMAS: To pack but fuck it we keep it
COLLINS: If so I'll send it next time
COLLINS: Ok. If I have time I'll grab
THOMAS: I told him to come to you so he has to take the dog to pets mart I told him to come to the old snucks after
THOMAS: Or send him location
THOMAS: Idk bae
COLLINS: Ok. Well just have him call when he on his way to pets mart and I'll figure it out [I interpret this to mean that COLLINS asked THOMAS to tell GRIFFIN to call her to discuss a meeting location.]
THOMAS: Ok sorry

Later on the same day, THOMAS and COLLINS exchanged the following messages:

COLLINS: Cuz? He ready?

COLLINS: Questioned "To ante"
THOMAS: You got hit cuz [A colloquial way of saying "You have to contact Cuz,"]
THOMAS: On the line I gave you ["Line" in this context refers to a specific phone numbe.r]
THOMAS: And bf I'll tell to leave it at antie ["Antie" is likely a misspelling of the word
"Auntie," implying "bf" will leave "it" at Auntie's residence. I interpret this to mean that "bf"
will leave money owed to THOMAS at THOMAS' aunt's residence for COLLINS to pick up
later.]
COLLINS: Ok babe
COLLINS: Liked "And bf I'll tell to leave it at antie "
COLLINS: I'll have to get with cuz in a min can't leave this second

Later on the same day, COLLINS sent the following messages to THOMAS:

COLLINS: Haven't heard from fat boy them. They did all that rushing just to take they time ☺
["Fat Boy" is the nickname of Darren FLOWERS, who DEA St. Louis Group 28 has identified
as a drug distributor in the GRIFFIN DTO.]
COLLINS: So when they call I'll get it all taken care of. But I'm not about to rush. Or have my
bosses tripping for no reason.
COLLINS: I got from here baby. It's all good. Wifey gone make sure it's done ☺☺

33.     SA Morton believes these exchanges capture THOMAS coordinating the delivery

of drug proceeds from several customers to COLLINS, and also discussion of what COLLINS

should do with those proceeds. THOMAS provides COLLINS a phone number determined by

investigators to be used by GRIFFIN, and clarifies that he (THOMAS) has had difficulty

contacting GRIFFIN. COLLINS clarifies the nature of this contact by explaining that GRIFFIN is

not "business oriented," which SA Morton interprets to refer to drug trafficking. THOMAS then

replies that GRIFFIN is in possession of "another 10," which SA Morton knows is a colloquial

way of referring to $10,000. COLLINS asks THOMAS if she should keep the $10,000 ("for me")

or ship it to THOMAS ("to pack"). THOMAS indicates the $10,000 should be shipped ("to pack")

but instead decides that he and COLLINS ("we") should keep it. Based on THOMAS' position as

a facilitator within the Tijuana Cartel, SA Morton believes THOMAS is tasked with receiving drug

proceeds, some or most of which is in turn owed to the cartel's senior leaders. COLLINS refers to

what SA Morton interprets as a regular pattern of shipping packages to THOMAS, as she offers to

"send it next time." THOMAS and COLLINS then discuss COLLINS meeting with GRIFFIN at a Schnuck's grocery store or at a PetSmart to conduct the exchange. During a second, related exchange, COLLINS asks THOMAS if GRIFFIN is ready to meet, indicating THOMAS is facilitating the transaction. THOMAS then directs COLLINS to contact "Cuz" on the phone number ("line") that he previously gave her, indicating GRIFFIN is the "Cuz" referred to in the messages. THOMAS also states that he will direct "BF" to leave "it" at "antie," which SA Morton believes is a misspelling of "Auntie." SA Morton interprets this statement to mean that THOMAS will direct "BF" to leave money owed to him at THOMAS' aunt's residence. In a third exchange, COLLINS informs THOMAS that she hasn't yet been contacted by GRIFFIN DTO distributor Darren FLOWERS (referred to by his nickname "Fat Boy"). COLLINS then reassures THOMAS that she will "get it all taken care of" once FLOWERS calls, but won't abruptly leave work and attract the unwanted attention of her supervisors ("have my bosses tripping").

### E.    COLLINS' Association to the Subject Property

34.    On February 26, 2021, the Honorable Judge David D. Noce, United States Magistrate Judge, Eastern District of Missouri, authorized the collection of the Precision Location Information (PLI) of COLLINS' phone number (314) 537-5575. Collection of the data began on March 1, 2021 and terminated on April 11, 2021. The PLI of COLLINS' phone was provided in the form of a set of latitude and longitude coordinates, along with a radius distance indicating the device's vicinity from the supplied latitude and longitude coordinates. SA Morton regularly reviewed the location data of the phone during the monitored period and noted that during nighttime hours, the device was frequently located in an area that included the **subject property**.

35.    COLLINS has been the Ameren utility customer at the **subject property** since March 2018, and the **subject property's** address is also listed on her Missouri driver's license and

vehicle registration. Both vehicles registered to COLLINS in Missouri – which includes the Range Rover described by CD #1 below – list the **subject property** as the registration address. For these reasons, I believe that the **subject property** is COLLINS' primary residence.

### F.   Storage of Drug Proceeds at the Subject Property

36.   I know based on my training and experience that a drug trafficking operation that distributes the amount of drugs that THOMAS distributes routinely has large amounts of bulk U.S. currency in stash locations. COLLINS' shipment of packages via USPS and DHL further support the investigative team's belief that COLLINS is engaged in the shipment of drug proceeds to THOMAS.

37.   On September 22, 2020, Inspector Wicks informed members of DEA Groups 28 and 33 that Danielle COLLINS had shipped an approximately 12-pound package believed to contain bulk currency to Tijuana, Mexico on August 26, 2020. Inspector Wicks had reviewed USPS business records pertaining to the suspected package. Inspector Wicks noted the package listed the sender as "Danielle N. Collins," with a return address of 5819 Ferris Avenue, St. Louis, Missouri 63120.  Inspector Wicks then conducted a law enforcement records check of 5819 Ferris Avenue, St. Louis, Missouri 63120, which confirmed COLLINS was last associated with the address in 2014 and is associated with six separate addresses since 2014. In Inspector Wicks' training and experience in conducting narcotic and money laundering investigations, those who mail laundered drug proceeds and/or bulk U.S. Currency will often use their real name and an address they previously resided at. This allows the sender to claim the package if it is not delivered to the intended location, is held by the USPS and returned to the sender, or potentially interdicted by law enforcement. Furthermore, if the package cannot be delivered to the intended location and it is returned to the sender, an actual address has been provided for the package to be returned. I

know from my training and experience that Mexico is a source country for illegal narcotics, and that the proceeds of domestic drug sales are often shipped back to the Mexico-based suppliers. It is notable that on the same day she shipped the suspected money package, COLLINS also shipped a second package via USPS and listed a sender address of 2826 Old Hanley Road, St. Louis, Missouri 63114, which is the home address listed on COLLINS' Missouri driver's license. The package was addressed to "Kannon Clerk." The name "Kannon Clerk" is nearly identical to the apparently fictitious name of "Kanon Clerk" listed on the "Ghost_8388" account. The package was addressed to Boulevard Agua Caliente 11998, #1605, Tijuana, Mexico 22024. It should be noted that an outgoing e-mail message found in THOMAS' iCloud account was sent to the Hyatt Andares on August 11, 2020. In the e-mail, THOMAS requested shoes he accidentally left at the hotel be returned to him via shipment to the same address listed on the package shipped by COLLINS. The investigative team believe this Tijuana address is THOMAS' residence.

38.     On November 9, 2020, Inspector Wicks provided the investigative team with a recording of a USPS customer service call placed by THOMAS inquiring about the package shipped by COLLINS. During the call, THOMAS identified himself as "Kanon Clerk," his alias, and then requested a status update of a package "stuck in transit" to Mexico. THOMAS provided the tracking number of the package shipped by COLLINS, stating he knew the tracking number "by heart." When asked by the operator for the sender's phone number, THOMAS provided COLLINS' phone number (314) 537-5575. During the call, THOMAS also stated, referring to the package, "Can I stop it and just return it back? Because I didn't even want her to send it direct by US mail anyway, I want it to come FedEx or DHL and she didn't know and rushed it and sent it out." This statement indicates to the investigative team that COLLINS sometimes uses DHL and/or FedEx to ship packages to THOMAS.

39.     On December 28, 2020, COLLINS' (314) 537-5575 phone number placed seven outgoing phone calls to (800) 225-5345, which is the customer service phone number for tracking DHL Express packages. SA Morton received DHL shipment records pertaining to COLLINS and three addresses associated with her in a commercial database. The shipment records listed four packages, two of which were shipped by COLLINS to THOMAS' suspected apartment building, and two that were sent from Tijuana, Mexico (the location of THOMAS' suspected residence) to COLLINS. The details of these packages as provided by DHL are as follows:

a.     October 26, 2020 – package shipped from 22020, BLVD Agua Caliente, 11988, Tijuana, Mexico, 22024, shipper contact name "Clerk Kanon," to Danielle Collins, 5819 Ferris Avenue, St. Louis, MO 63120. It should be noted that "Kanon Clerk" is the alias frequently used by THOMAS, and the shipping address is the location of his suspected residence. The recipient's phone number was listed as (323) 253-4701, the same phone number investigators previously suspected was used by COLLINS to communicate with THOMAS via iMessage. The description of the box's contents was "02 pairs of new tennis," which possibly refers to a claim that the box contains two pairs of tennis shoes. The package weighed five kilograms and cost $191.20 to ship. The export reason was listed as "unsolicited gift." The package was delivered on October 29, 2020 and signed for using the name "Collins."

b.     December 21, 2020 – package shipped from the **subject property**, shipper contact name Danielle COLLINS, to "Cannon Clerk," Boulevard Agua Caliente 11998, 1605, Tijuana, MX 22024. It should be noted that the package was addressed to THOMAS' alias and specified Apartment #1605, the same apartment number THOMAS identified in the e-mail recovered from his iCloud account that was described above. COLLINS listed her phone number of (314) 537-5575 as the shipper phone number, and the recipient phone number was listed as

(469) 588-1893, the same phone number THOMAS used to communicate with COLLINS in the iMessages described above. The package weighed 21.9 pounds and its contents were described as "gifts of clothes, shoes, watch bands, purse."

      c.    March 10, 2021 – package shipped from the **subject property**, shipper name of Danielle COLLINS, to "Kanon Clerk," BLVD Aqua Caliente 11988-Local 4, Agua-Caliente Tijuana, Mexico. The package weighed 35.6 pounds and its contents were described as "clothes, shoes." On May 7, 2021, SA Morton coordinated with DHL legal department personnel, who reviewed additional information pertaining to that shipment and stated the package's shipment history indicated it was returned to the sender. The shipper and recipient phone numbers were the same as those listed on the shipping details of the December 21, 2020 package.

      d.    March 18, 2021 – package shipped by Ruben Aguero, 565A Calle Uno NTE, Tijuana, MX 22500 to COLLINS at the **subject property**. The listed recipient phone number was the same phone number described in the December 21, 2020 and March 10, 2021 packages. The package weighed 16.13 kilograms and its contents were described as "clothes, shoes." The package was delivered on March 24, 2021 at 6:44 p.m. and signed for by "D Collins," with a signature bearing the initials "DC." DEA investigators were monitoring court authorized geolocation data of COLLINS' (314) 537-5575 phone at the time the package was delivered. Review of that data reveals on March 24, 2021 at approximately 6:45 p.m., COLLINS' phone was within 364 meters of an area that includes a DHL Express Service Point at 1612 Park 370 Court, Hazelwood, MO 63042. The next geolocation "ping," received at approximately 7:00 p.m., indicated COLLINS' phone was in the vicinity of the intersection of Interstate Highway 170 and Natural Bridge Road, approximately one mile away from the **subject property**. The next "ping," received at approximately 7:15 p.m., indicated COLLINS' phone was located in an area that

includes the **subject property**. Based on this series of pings, SA Morton believes that COLLINS

traveled in a direct route from the DHL Express Service Point to the **subject property**. Spot checks

of subsequent pings at 10:18 p.m., 11:50 p.m., and on March 25, 2021 at 2:07 a.m., 4:09 a.m., 6:11

a.m., and 8:12 a.m. revealed COLLINS' phone remained in the vicinity of the **subject property**,

indicating to the investigative team that COLLINS traveled with the package from the DHL

location to the **subject property** and then remained at the **subject property** for the remainder of

the night.

40.     In February 2021, members of the investigative team met with a cooperating

defendant (hereinafter "CD #1") regarding his/her knowledge of the GRIFFIN DTO.  CD #1

provided statements against self-interest, and statements which could be verified by investigators,

in an effort to receive leniency in CD #1's pending criminal case for narcotics distribution.[2]  CD

#1 described a time when he/she received money at GRIFFIN's direction from a male not known

to CD #1.  CD #1 described a separate occasion when he/she received a book bag from GRIFFIN

and was directed to meet an unidentified female driving a Range Rover at the Quick Trip gas

station located at the intersection of Interstate Highway 170 and Page Boulevard. CD #1 believes

the book bag contained an undetermined amount of U.S. currency. The **subject property** is

approximately 1.2 miles away from the Quick Trip. COLLINS is the registered owner of a 2019

Landrover Range Rover, and the **subject property** is the registration address.

### G.     Documents and Digital Media Likely to be at the Subject Property

41.     Based on my training and experience and that of my team, I know that the operation

of a large scale drug trafficking organization generates a substantial amount of documents and

---

2. CD #1 has been arrested for theft related offenses and is currently on probation.  CD #1 voluntarily provided
statements against self-interest and information he/she has provided has been corroborated by toll records, controlled
buys, surveillance, and through various other means.

records through its day-to-day operations, and that documents and records of this kind are likely to be located in the **subject property**.

1) Records Showing Straw Purchases

42.     I know that drug traffickers often register or buy assets in the names of other subjects to attempt to thwart law enforcement detection and to attempt to insulate the asset from being seized by law enforcement. These assets are typically purchased with drug proceeds. Messages found in THOMAS' iCloud account indicate THOMAS purchased a vehicle for COLLINS, utilizes her to purchase homes for him, and pays COLLINS' living expenses.

43.     On July 17, 2020, THOMAS using phone number (972) 880-5158 and COLLINS using phone number (323) 253-4701 exchanged the following messages:

THOMAS: I wish I could present you your car
COLLINS: Me too. It's kind of making me sad. It's bitter sweet.
THOMAS: Emphasized "Me too. It's kind of making me sad. It's bitter sweet"
THOMAS: I'm here tho bae and I'm doing all I can so that you set for life
COLLINS: Like I'm really happy I'm getting my car. I am. I'm happy for everything you do for me. Sometimes I just get sad and wish you were here [As previously stated, THOMAS fled the area in 2019 following investigator's recovery of bulk fentanyl and money from a storage unit used by THOMAS.]

44.     On January 8, 2021, SA Morton obtained the Missouri vehicle registration records of COLLINS, which identified two vehicles registered in her name. One vehicle, a 2019 Landrover Range Rover, listed a purchase date of August 4, 2020, with a lien held by Navy Federal Credit Union. It is notable that COLLINS' birthday is August 8, just four days after the purchase date of the vehicle. Investigators intend to pursue additional information about the vehicle's purchase to determine its purchase history.

45.     On July 20, 2020, THOMAS using phone number (972) 880-5158 and COLLINS using phone number (323) 253-4701 exchanged the following messages:

COLLINS: Baby what's my budget

THOMAS: You already set it boo
THOMAS: The plan was
THOMAS: To pay your car off and $7500 down payment
THOMAS: Wat
THOMAS: Wyt [A common abbreviation for "What are you thinking?"]
COLLINS: For tomorrow babe
THOMAS: 25k
THOMAS: Bae i told you boo
COLLINS: Ok. I know. I wanted to be sure
THOMAS: Cause we can put that back tomorrow
THOMAS: When you see bf
COLLINS: Ok babe.

46.    The next day, COLLINS sent THOMAS a message that stated: "This shit is crazy.

And all my houses gone. It's 2 that I'm going to try and bid on. 🙏 all theee ppl came and paid

they taxes and shit."

47.    On November 13, 2020, THOMAS using phone number (213) 304-9743 and

COLLINS using phone number (323) 253-4701 exchanged the following messages:

THOMAS: Bae I hustle for you and the kids
THOMAS: To make sure you comfortable
THOMAS: And it's clear you comfortable and have no real worries
THOMAS: And that makes me comfortable
COLLINS: Me too. I wish I was there when you first came home. I really think things would
have been so different
THOMAS: I don't worry about the paper because you doing right by it ["Paper" is a colloquial
term for "money."]
COLLINS: Liked "And it's clear you comfortable and have no real worries "
COLLINS: Loved "And that makes me comfortable "
COLLINS: I just want us to win baby. You see I still bust my ass and work all the time.
COLLINS: Loved "I don't worry about the paper because you doing right by it "
THOMAS: Just know my appreciation for you is beyond words
COLLINS: I know I don't have to. But I do it anyway.
COLLINS: Loved "Just know my appreciation for you is beyond words "
COLLINS: I appreciate you more babe 😋😋
THOMAS: Yea bae you still grind but the average billionaire has 7 different incomes
COLLINS: Facts. 💯💯
THOMAS: So I love that you didn't quite and just depend on the paper put up [Investigators
believe "quite" is a misspelling of the word "quit."]

48.     Based on these messages, I believe THOMAS is paying many of COLLINS' living expenses and it is likely that documents and records associated with these straw purchases and others will be located at the **subject property**.

2)  Shipping Records

49.     As previously described, the investigative team has learned that COLLINS is the resident of the **subject property** and has sent or received packages to or from Tijuana, Mexico, listing the **subject property** as the shipping or delivery location. Two other packages sent to or from THOMAS' suspected residence used the Fair Avenue address COLLINS was previously associated with. As described above, investigators know that drug traffickers will sometimes use a previous residence to ship or receive contraband, consequently ensuring that the delivery location can be accessed without associating one's actual residence with the suspicious package.

50.     The investigative team knows from its training and experience that the shipment or receipt of packages generally produces receipts or other documentation of the shipment, and that packaging materials are also employed in this activity. The investigative team knows through its training and experience in executing search warrants on locations used to receive and store packages that contain narcotics and/or the proceeds of narcotics sales, that packages, packaging materials, receipts, mailing labels, and related shipping products remain within the residence.

3)  Wireless Telephones

51.     As described above, COLLINS is believed to possess at least three telephones, two of which are likely "burner phones" used to communicate with a much smaller number of callers than the phone number listed on COLLINS' Ameren account. I know from my training and experience that those engaged in drug trafficking will frequently possess and use what are colloquially referred to as "burner phones." These phones are often prepaid devices, or listed in

the name of a customer other than the actual user, as a means to disguise the phone's true user. "Burner phones" allow a drug trafficker to distance themselves from the device, making it more difficult to detect by law enforcement. These phones are used to facilitate drug trafficking activities, and also afford the user the ability to segment their various trafficking related communications across several devices, thus obfuscating the nature and extent of their communications. I also know that these phones are sometimes cycled in and out of usage to frustrate law enforcement attempts to intercept a given device's communications.

52.     Based on phone toll analysis and the messages described above, I believe COLLINS periodically changes phone numbers and discontinues service to previously used phone numbers as a means of eluding law enforcement detection of her communications. For instance, on May 10, 2021, SA Morton obtained subscriber information and phone toll records for phone number (323) 253-4701, which as described above was believed to be a phone number used by COLLINS. A review of the phone's subscriber information revealed a new customer activated an account with that phone number on February 14, 2021 with a subscriber name and address different than the one previously listed during the timeframe COLLINS was believed to be using the phone number. The investigative teams knows that drug traffickers will commonly periodically change phone numbers, but also know that drug traffickers will often keep the same wireless telephone and simply route the new phone number to the existing wireless telephone, rather than purchasing a new device.

53.     I also know that wireless telephones possess applications that can be used to store drug transaction information, ledgers, contact information, and other such records. This data can also be synchronized across devices and stored on other wireless telephones, tablets, and/or computers if the user makes use of a cloud-based storage service or manually transfers records

from device to device. Notes applications, as well as DHL and/or USPS applications, can contain data pertaining to the shipment of suspicious package and/or the packages' contents.

54.    Wireless telephones are also frequently used to communicate via various messaging applications. I am aware that drug traffickers frequently use end-to-end encrypted communication applications to securely communicate with their co-conspirators. These applications are sometimes designed to purge those communications after their transmission from any external server associated with the application, thus making the data impossible to retrieve remotely. I also know that a wireless telephone's storage options can be adjusted to prevent uploading of data to a cloud-based storage platform. For instance, iMessages recovered from THOMAS' iCloud account covered a period of December 2019 to March 2020, July 12 – 21, 2020, and November 12 – 30, 2020. SA Morton suspects COLLINS and THOMAS continued to communicate between these timeframes, but that the gaps could have been caused by THOMAS altering his iCloud storage usage. As a consequence of traffickers' use of secure messaging applications and localized storage, I know that wireless devices can sometimes be the sole storage media where certain communications, images, and financial transaction records are stored and retrievable. Investigators believe the "burner phones" likely used by COLLINS to communicate with THOMAS, a federal fugitive and cartel facilitator, contain valuable evidence of the drug conspiracy's coordination and illegal activities.

55.    Wireless telephones can also possess text messages, call logs, and other records of communications that serve as valuable evidence in a drug conspiracy. Based on the information described above, investigators already know that COLLINS makes uses of text messaging to communicate with THOMAS, and specifically to discuss drug trafficking activities. From my training and experience, I know that drug traffickers sometimes use encrypted communications

applications, which allow traffickers to communicate securely without a means for law enforcement to capture the content of those communications. These messages may be stored solely on the device used to send such messages, making it the only container of such evidence.

56.     Based on the above, and the training and experience of the investigative team, drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, receipts for telephone purchase/service; cellular telephones; computers capable of e-mail communication; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with persons known to traffic in controlled substances or to facilitate such trafficking.   These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

### 4) Tablets and Digital Storage Media

57.     Based on my training and experience, I know that tablets can be used like a wireless telephone to access a wide array of websites and applications that are used to facilitate money laundering and drug trafficking activities. For instance, tablets can be used to access banking and real estate websites, shipping websites, secured communication applications (such as WhatsApp), and social media sites that facilitate private messaging between parties. Information contained on these devices can also provide evidence related to the usage of drug proceeds, such as purchase records. I also know that tablet and storage media are capable of storing digital data for later retrieval. Other aspects of a suspect's online activities, such as their internet search history, can also serve as evidence of drug trafficking and/or money laundering offenses.

58.     Storage media, to include such items as external hard drives and thumb drives, can also be used to store pictures, documents, records, invoices, bank statements, and other such indicia

of drug trafficking and money laundering activities. External storage media can be physically disconnected from a computer, thus allowing storage of digital files that cannot be accessed remotely and require physical possession of the storage media.

59.     As previously described, investigators know COLLINS and THOMAS communicate via messaging applications. Investigators also suspect COLLINS is being financially supported by THOMAS and has or has attempted to purchase residences on his behalf. COLLINS has sent to or received packages from THOMAS believed to contain drug proceeds via commercial shipping companies. Evidence described above indicates COLLINS has traveled to various locations to meet others, pick-up money, or otherwise aid THOMAS' drug trafficking. Consequently, the investigative team believes it is highly likely that COLLINS' tablets which commonly contain applications that COLLINS has utilized to further drug trafficking will be inside the **subject property** and will contain evidence of drug distribution involving COLLINS, THOMAS and others. It is also likely that evidence of the activity that occurred via these digital devices were stored on digital storage media located at the **subject location.**

5) Other Documents

60.     Based upon my and the investigating teams experience and our participation in other pending and completed controlled substance and/or financial investigations involving ongoing, extensive drug distribution conspiracies involving large amounts of controlled substances and money, I know the following:

a.      It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

b.      Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, digital devices, electronic devices, routers, money

orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  Drug traffickers commonly "front" (provide drugs on consignment) controlled substances to their clients.  The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

c.       Drug traffickers take or cause to be taken photographs of them, their associates, their property and their product.   These traffickers frequently maintain these photographs in their residence or other buildings under their control.

d.       Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

e.       When drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits.  I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.   They maintain record of these transactions in their residence or other buildings under their control.

f.       Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in drug prosecutions.

g.       Fentanyl and cocaine are not commonly manufactured within the State of

Missouri.  It is common for drug traffickers to travel to major distribution centers to purchase drugs and/or to arrange for its distribution elsewhere in the United States.  After purchasing drugs, these drug traffickers will transport or cause to be transported, drugs to the areas in which they will distribute the drugs.  The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers.  Records of their travel are frequently kept in their residence or other buildings under their control.

## VI.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

61.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

62.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only records and other documents, but also electronically stored information on wireless telephones or tablets found at the **subject property**. The electronically stored information might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how those devices were used, the purpose of their use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on these devices because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    Forensic evidence on a device can also indicate who has used or controlled

the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

63.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of wireless phones and/or tablets found on the premises of the **subject property** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of these devices to human inspection in order to determine whether it is evidence described by the warrant.

## VIII.   CONCLUSION

64.   Based on the preceding information, I believe THOMAS and others are distributing

fentanyl and cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and laundering the proceeds in violation of Title 18, United States Code, Sections 1956 and 1957. I further believe that the aforementioned **subject property** is a location used by COLLINS to store and ship drug proceeds to THOMAS, as well as devices used to communicate with THOMAS about these activities. Accordingly, my team and I believe that wireless telephones, tablets, drug proceeds, shipping records, and/or documents evidencing participation in drug trafficking and the laundering of drug proceeds will be found at the aforementioned **subject property**.

65.    In view of the ongoing nature of the investigation, and the risk of harm to informants, to agents, and to the investigation which would exist should the information in this affidavit be prematurely disclosed, I respectfully request that this affidavit and associated records concerning these searches be sealed until further order of the Court.

I state under the penalty of perjury that the foregoing is true and correct.

CHRISTOPHER MOST
Special Agent
Drug Enforcement Administration

Sworn to, attested to and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this 21ˢᵗ day of May, 2021.

STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

31

### *Attachment A*

**Subject Property**

The premises located at **2826 Old Hanley Road, St. Louis, Missouri 63114**. The **subject property** is a two story, split level residence, with the front of the residence constructed of vinyl. The **subject property** has a white garage door and the entrance to the residence faces the approximate west. The **subject property** includes the house's front and back yard, as well as any vehicles or outbuildings present on the **subject property's** curtilage. A photograph of the **subject property** is attached hereto as Attachment A.



# ATTACHMENT B

## *Property to be seized*

1.      All records and information relating violations of Title 21, U.S.C. §§ 841(a)(1), 846 (possession with intent to distribute narcotics and conspiracy to distribute narcotics), and Title 18, United States Code, Sections 1956 and 1957 (laundering of monetary instruments), that constitutes fruits, evidence and instrumentalities of those violations involving Kenneth THOMAS and Danielle COLLINS, including:

    a.  Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

    b.  Books, records, receipts, notes, ledgers, computer hard-drives and disk records, digital devices, electronic devices, routers, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

    c.  Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service;

    d.  Digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room and/or digital communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

    e.  Wireless telephones and/or tablets;

    f.  Storage media;

g. Photographs, in particular photographs of co-conspirators, assets and/or controlled substances;

h. United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

i. Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

j. Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri and elsewhere;

k. Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys.

2. Evidence of user attribution showing who used or owned the wireless telephones and/or tablets at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

        4.      The term "storage media" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.